Filed 10/29/13  P. v. Roman CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ROBERT GONZALES ROMAN,<br><br>Defendant and Appellant. | F063876 & F064289<br><br>(Super. Ct. Nos. CRM017492, CRM012650, CRM013284)<br><br>**OPINION** |

-ooOoo-

APPEALS from a judgment of the Superior Court of Merced County.  Ronald W. Hansen, Judge.

Jeremy Valverde, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Leanne LeMon, and Lewis A. Martinez, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

**INTRODUCTION**

Defendant Robert Gonzales Roman appeals his conviction, following jury trial, asserting:  (1) the trial court erred in allowing uncharged crimes evidence to provide his identity as the driver because the driver's identity was contested; (2) trial counsel had a

duty to request the jury be instructed regarding third party culpability and his failure to do so amounted to ineffective assistance; (3) the trial court allowed prejudicial evidence of defendant's poverty to be admitted, thereby violating his rights to a fair trial and due process; (4) the prosecutor committed misconduct by misstating the law during closing argument; (5) trial counsel was ineffective for failing to object to the aforementioned prosecutorial misconduct; and (6) the trial court erred when it found defendant was not eligible for sentencing pursuant to Penal Code[1] section 1170.9.  We will affirm the judgment.

## RELEVANT PROCEDURAL BACKGROUND[2]

By information, the Merced County District Attorney alleged defendant had committed the following:  count 1, unlawful driving of a vehicle (Veh. Code, § 10851, subd. (a)); count 2, evading an officer with reckless driving (Veh. Code, § 2800.2, subd. (a)); count 3, receiving stolen property (§ 496, subd. (a)); count 4, reckless driving (Veh. Code, § 23103, subd. (a)); and count 5, resisting an officer (§ 148, subd. (a)(1)). Defendant subsequently pled not guilty to all counts.

Prior to trial, the People moved to admit evidence of defendant's prior offenses pursuant to Evidence Code section 1101, subdivision (b).  Following argument, the trial court permitted evidence of a November 5, 2006, incident.

Jury trial commenced September 20, 2011.  On September 27, 2011, the jury found defendant guilty of counts 1, 2, 4 and 5.

On November 29, 2011, defendant was sentenced to three years in state prison for evading an officer with reckless driving and a consecutive eight-month term for the unlawful taking or driving of a vehicle.  As to the trailing violation of probation cases, Nos. CRM012650 and CRM013284, the court imposed consecutive eight-month terms

---

[1]All further statutory references are to the Penal Code unless otherwise indicated.

[2]On May 14, 2012, the court consolidated its case numbers F063876 and F064289.

for each case. Thus, defendant was sentenced to a total of five years in prison. This appeal followed.

## FACTUAL BACKGROUND

On the evening of April 22, 2011, Alan Arancibia invited "Linda" back to his home. Sometime after he fell asleep, Linda disappeared, as did his keys and his 2001 GMC Jimmy SUV. The following morning, Arancibia reported the theft to Merced police.

On May 5, 2011, at about 9:30 p.m. Merced police officer Gerald Bohanan was on patrol. In an area known for stolen vehicles, the officer ran the license plate of an SUV in front of him. Dispatch indicated the vehicle had been reported stolen.

When the driver of the vehicle did not stop, a pursuit ensued. Bohanan's "dash cam," i.e., a dashboard-mounted video camera, recorded the chase.[3] Meanwhile, Merced police officers Brian Rinder and Eduardo Chavez responded to assist Bohanan. Also responding was Sergeant Kevin Blake with the Merced County Sheriff's Office, who had been monitoring radio traffic for the City of Merced.

As the suspect and Bohanan approached the intersection of Glen Avenue and 21st Street, Rinder approached from the opposite direction. Approximately 10 yards from the vehicle as it passed, Rinder observed defendant driving the SUV. He recognized defendant as the driver of the vehicle given the shape of his head and face, and his hairstyle. Rinder later advised Bohanan that defendant was the driver of the stolen SUV.

Eventually the vehicle slowed and the passenger and driver of the stolen SUV jumped from the vehicle, exiting via the passenger door (the driver's side door was inoperable). Rinder identified defendant as the second person to exit the vehicle.[4]

---

[3]The video was played for the jury. We have reviewed the video footage as well.

[4]Rinder believed the driver of the vehicle was wearing a black shirt. His report reflects the same. However, Rinder acknowledged the dash cam video from Bohanan's patrol vehicle shows the individual he identified as defendant was wearing a light or white colored shirt. In any event, Rinder's confusion regarding the color of the driver's shirt did not affect his identification of defendant as the SUV's driver in any way.

3.

Bohanan testified the second person to exit the SUV was wearing a white shirt, black shorts and white socks. The other occupant of the SUV was never identified or arrested.

Sergeant Blake heard on the radio the description of two fleeing suspects. As he neared the area of the stopped SUV, Blake noticed a person running northbound out of a residential area. The individual then stopped and began walking westbound. Blake illuminated the individual with his spotlight and ordered him to the ground at gunpoint. That individual was later identified as defendant. Defendant was sweating profusely and appeared to be out of breath. He was wearing black shorts and carrying a white T-shirt.[5]

While conducting a yard-to-yard search, Rinder found a pair of sunglasses with blood on them in a small alleyway behind a nearby house. Elsewhere, Chavez found a black bag on the ground in a nearby backyard, about 100 feet from the SUV. Inside the bag were glass figurines or ornaments, two cell phones, a pink MP3 player, and paperwork in the name of Michael Donald Jorgenson; Jorgenson could not be contacted or found.

A subsequent search of the rear of the SUV revealed documents bearing defendant's name and a number of keys belonging to various vehicle makes, house keys, and a shaved key, typically used to facilitate entry or to start the ignition of a vehicle other than the one for which the key was intended. Also found in a bag inside the SUV were burglar tools, consisting of screwdrivers, electrical wire, filing tools, a pry tool and a mini crowbar, bolt cutters, a black metal flashlight, a set of small tools, a ceramic or porcelain tool used to break windows or glass, and cell phone batteries. A larger bag contained darts in a pouch, a cell phone without a battery, an AAA lockout card, an eyeglass case, and a trash bag. Another cell phone was found on the SUV's floorboard. Finally, three T-shirts bearing the word or insignia "Barhoppers" were also found in the

---

[5]Defendant's clothing confiscated at booking included black shorts and white socks; it was received into evidence during trial.

SUV. Bohanan took fingerprints from the driver and passenger sides of the vehicle, and from the back lift gate of the SUV. Ultimately, Bohanan transported defendant to jail.

A fingerprint analyst with the Department of Justice analyzed five latent fingerprint cards. Of those five, latent print card No. 2 contained prints lifted from the rear bottom half of the SUV's back door. Those prints matched defendant's right middle finger and right ring finger. The remaining fingerprints lifted were not usable or did not belong to defendant.

## DISCUSSION

### A. Evidence Code Section 1101, Subdivision (b)

Defendant contends the trial court erred by allowing evidence of an uncharged crime to prove defendant's identity as the driver. As a result, defendant contends his constitutional rights to a fair trial and due process have been violated, requiring reversal of his conviction. The People assert the evidence was admitted to show common design and plan, not identity, and that defendant was not prejudiced by its admission.

#### 1. Legal Standards

Evidence Code section 1101 provides as follows:

> "(a) Except as provided in this section and in Sections 1102, 1103, 1108, and 1109, evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion.

> "(b) Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act."

"Subdivision (a) of [Evidence Code] section 1101 prohibits admission of evidence of a person's character, including evidence of character in the form of specific instances of uncharged misconduct, to prove the conduct of that person on a specified occasion.

Subdivision (b) of [Evidence Code] section 1101 clarifies, however, that this rule does not prohibit admission of evidence of uncharged misconduct when such evidence is relevant to establish some fact other than the person's character or disposition." (*People v. Ewoldt* (1994) 7 Cal.4th 380, 393, superseded by statute on another ground as stated by *People v. Britt* (2002) 104 Cal.App.4th 500, 505.)

The trial court's ruling under either Evidence Code section 1101 or Evidence Code section 352 is reviewed on appeal for abuse of discretion. (*People v. Homick* (2012) 55 Cal.4th 816, 865; *People v. Lenart* (2004) 32 Cal.4th 1107, 1123; *People v. Kipp* (1998) 18 Cal.4th 349, 369.)

Evidence of crimes not charged in the present proceeding, though sometimes admissible for the purposes set forth in Evidence Code section 1101, subdivision (b), must be handled with care:

> "It is … well settled that evidence may be admitted, even though it embraces evidence of the commission of another crime, if it logically tends to prove a material element in the People's case. [Citations.] However, 'It has frequently been recognized … that because of the sound reasons behind the general rule of exclusion, the relevancy of evidence of other crimes, and therefore its admissibility, must be examined with care. [Citation.] The evidence should be received with "extreme caution," and if its connection with the crime charged is not clearly perceived, the doubt should be resolved in favor of the accused. [Citations.]'" (*People v. Guerrero* (1976) 16 Cal.3d 719, 724.)

Even when evidence is relevant under Evidence Code section 1101, subdivision (b), it must be excluded under Evidence Code section 352 if its prejudicial effect substantially outweighs its probative value:

> "Our conclusion that [Evidence Code] section 1101 does not require exclusion of the evidence of defendant's uncharged misconduct, because that evidence is relevant to prove a relevant fact other than defendant's criminal disposition, does not end our inquiry. Evidence of uncharged offenses 'is so prejudicial that its admission requires extremely careful analysis. [Citations.]' [Citations.] 'Since "substantial prejudicial effect [is] inherent in [such] evidence," uncharged offenses are admissible only if they have *substantial* probative value.' [Citation.] [¶] … We thus proceed to examine whether the probative value of the evidence of defendant's

6.

uncharged offenses is 'substantially outweighed by the probability that its admission [would] … create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' (Evid. Code, § 352.)" (*People v. Ewoldt*, *supra*, 7 Cal.4th at p. 404.)

## 2.     Relevant Testimony

California Highway Patrol Sergeant Jeremy Key testified regarding a November 5, 2006, incident. On that date, at about 11:15 p.m., Key was on patrol in the County of Merced. Key observed a white Dodge pickup truck with a missing front license plate; he executed a U-turn and attempted to pull over the vehicle, which he noticed had a defective rear taillight. The vehicle did not yield.

The vehicle pulled into a trailer park. The driver—the only occupant—then suddenly opened the door and took off running west. The vehicle continued forward; the door remained open. Key's partner pursued the driver. Key stopped the vehicle before it hit anything. The driver jumped a fence and was not apprehended. Nevertheless, Key did get a look at the driver before he ran from the truck. Defendant was the driver of the truck.

The truck had been reported stolen. Following a search, Department of Motor Vehicle documents bearing defendant's name were found in the truck. Additionally, other personal items, clothing and toiletries were located, as were a number of tools.

## 3.     The Trial Court's Ruling

Defense counsel argued the evidence should not be admissible, and the following colloquy occurred:

> "[DEFENSE COUNSEL:] But [the prosecutor] is seeking to admit this under some sort of theory. He wants it to prove intent. I don't think intent is a material issue in this case, so I don't think that the evidence is relevant for that reason. I don't think it's going to be a disputed issue at trial whoever, whoever possessed the vehicle seemed to intend to possess stolen property.
>
> "[PROSECUTOR]: If I can clarify one thing, Your Honor. I'm going to bring a—I'm going to bring in—if the Court will allow me, I'm going to bring in a police officer, Officer Key, who's going to say that in this prior incident he actually saw the defendant … driving that vehicle.

"Now [defendant] may have pled to 496, that's quite true, but the evidence that prosecution is going to put on is that the defendant, once again, was driving the stolen vehicle; once again, was alluding [*sic*] the police; and once again, left—engaged in this unusual technique of letting the vehicle continue to roll, which is exactly what happened in the case before the court ….

"THE COURT:  The evidence is really not being offered for intent, but to show a common plan and modis operandi.  And it is distinctive.  I have to say it is distinctive that in the face of apprehension that to create a diversion and the necessity to focus on the vehicle and get it stopped to prevent further damage as opposed to giving chase, that is distinctive.

"And the officer in 2007 [*sic*:  2006] incident is positive it was—there was only one person in the vehicle?

"[PROSECUTOR]:  Yes.  Yes, to both questions, Judge.

"THE COURT:  And he's clear on his identification.

"[PROSECUTOR]:  In his police report he says he was sure it was the defendant that was driving.

"THE COURT:  Okay.  …[¶] … [¶] [Y]ou know, the distinctive element is that there is a greater degree of similarity required in order for the 1101(b) to come in under common plan or modis operation. I think it falls in that category. It is distinctive.

"[DEFENSE COUNSEL]:  Your Honor, I'd ask the Court to go through the 352 balancing test.  I think that the fact that [the prosecutor] alleges from the 2007 [*sic*:  2006] event creates a substantial risk of confusing the jury about what is it that they're suppose to be deciding, whether they are deciding who was the driver of the 2007 [*sic*:  2006] event or this event.  I think it also involves undue consumption of time.  And I think that the danger of prejudice to [the defendant] is great.  [¶] … [¶]

"THE COURT:  Okay.  It doesn't fall under that category as far as confusion of the issues.  What's your argument, again, on confusion of the issues …?

"[DEFENSE COUNSEL]:  [The prosecutor] wants to put before the jury two, at least according to him, identical crimes separated by five years.  I think there is a risk that the jury is going to be caught up and focusing on what happened in 2007 [*sic*:  2006] case as opposed to what happened in this particular case.  When you have facts like he's alleging, and the facts

8.

that he's trying to prove up in the current case, there is a risk that the jury is going to be confused about what they're suppose to be deciding.

"THE COURT:  Yeah, I don't believe that there is a risk of confusion of the issues between the 2007 [*sic*:  2006] and the May 2011 events.  The jury is going to be made well aware that the focus is the May 2011 crimes for which he's charged.  And there are cautionary admonitions with respect to 1101(b) evidence.

"Well, I'll think about the 352 issue, but my tentative is to allow it. I'll think about it some more over the lunch hour, but right now it has to be unduly prejudicial, and it's prejudicial to [defendant].  There is no question about it.  It's prejudicial.

"But that distinctive similarity of letting that vehicle, jump out of a moving vehicle and letting it head down the road or whatever it's headed and both officers in each case say it was [defendant] driving.

"Okay.  Tentatively it's coming in.  That's the only prior uncharged or prior uncharged conduct you want admitted?

"[PROSECUTOR]:  Yes, Your Honor."

Later, after denying the prosecutor's request regarding additional uncharged crimes evidence, the court stated, "if I change my mind on the November 5th, '06 incident then the other two will come in, but right now the November 5th, '06 incident comes in."

### 4. Analysis

Here, the evidence was offered to prove a fact other than defendant's character or identity, and thus, the evidence is not prohibited. (*People v. Ewoldt*, *supra*, 7 Cal.4th at p. 393.)  The record establishes the evidence of the November 2006 incident was admitted to establish defendant's common plan:  when confronted by law enforcement attempting to stop him while operating a stolen vehicle, defendant jumps from the moving vehicle and flees, requiring the officer to focus on stopping the runaway vehicle versus stopping defendant.  The trial court expressly admitted this evidence for that purpose. (*People v. Ewoldt*, *supra,* 7 Cal.4th at p. 406 ["it is imperative that the trial court determine specifically what the proffered evidence is offered to prove, so that the

probative value of the evidence can be evaluated for that purpose"].)  The People argued this common plan in closing arguments to the jury.**6**

"The probative value of the uncharged offense evidence must be substantial and must not be largely outweighed by the probability that its admission would create a serious danger of undue prejudice, of confusing the issues, or of misleading the jury." (*People v. Kipp*, *supra,* 18 Cal.4th at p. 371.)  We review the trial court's determination in this regard for abuse of discretion.  (*Ibid*.)

The California Supreme Court has identified various factors in determining whether the probative value of the evidence is outweighed by its prejudicial effect. Specifically, "(1) whether the inference of a common design or plan is strong; (2) whether the source of evidence concerning the present offense is independent of and unaffected by information about the uncharged offense; (3) whether the defendant was punished for the prior misconduct; (4) whether the uncharged offense is more inflammatory than the charged offense; and (5) whether the two incidents occurred close in time."  (*People v. Dancer* (1996) 45 Cal.App.4th 1677, 1690, disapproved on other grounds in *People v. Hammon* (1997) 15 Cal.4th 1117, 1123; see *People v. Ewoldt*, *supra*, 7 Cal.4th at pp. 404-405.)

The prior incident and the current offense are very similar, and thus there is nothing to suggest the inference of a common plan or design is weak.  Defendant contends that "bailing from a vehicle while fleeing police" is "not so unusual to be like a signature …, but instead a natural response to the circumstances."  As we have already noted, the evidence was offered to prove common plan, rather than identity.  Therefore, the evidence was not required to be "'so unusual and distinctive as to be like a signature.'"  (*People v. Ewoldt*, *supra*, 7 Cal.4th at p. 403.)  In any event, the cases cited by defendant in support of his assertion are wholly unpersuasive.  Unlike this case, none

---

**6**The abandonment of personal documents and effects that identify defendant as an occupant of the vehicle is also a similarity between these two incidents.

of those cases involved uncharged crime evidence regarding a common plan. Rather, a review of those cases reveals merely that each case involved a defendant who fled from police and jumped from a moving vehicle in order to escape. None of the cases involved prior incidents of similar conduct. In this case, the prior incident and the current offense both involved defendant in a stolen vehicle, fleeing from a marked patrol vehicle, where the driver leapt from the moving vehicle in an attempt to escape an arrest. In each instance, defendant's belongings were left behind in the stolen vehicle. We hold that the uncharged conduct and the charged offense are sufficiently similar to support an inference of common plan or design. (*People v. Ewoldt*, *supra*, 7 Cal.4th at pp. 401-402.)

Next, defendant contends the 2006 incident is too remote in time to be of probative value.

> "However, '[n]o specific time limits have been established for determining when an uncharged offense is so remote as to be inadmissible.' (*People v. Branch* (2001) 91 Cal.App.4th 274, 284.) And similar time periods have been approved in other cases. (See *People v. Ing* (1967) 65 Cal.2d 603, 612, questioned on other grounds in *People v. Tassell* (1984) 36 Cal.3d 77, 89 [15 years before charged offenses]; *People v. Branch*, *supra*, 91 Cal.App.4th at pp. 284–285 [more than 30 years]; *People v. Waples* (2000) 79 Cal.App.4th 1389, 1395 [18 to 25 years].)" (*People v. Spector* (2011) 194 Cal.App.4th 1335, 1388-1389.)

We are not persuaded the November 2006 incident is too remote in time. It occurred less than five years prior to the charged crimes.

We have already determined this evidence was not offered to prove defendant's identity. Nevertheless, we briefly address defendant's assertions that his identity as the driver was a "close call." We disagree. While the jury requested the readback of certain testimony, those requests and the jury's question did not necessarily pertain solely to identity. In fact, the jury heard readback of Officer Rinder's entire testimony on direct examination.[7]

---

[7]We note the minute order regarding this day's proceedings is somewhat confusing with regard to what requests were made by the jury and what testimony was re-read. In any event, because the reporter's transcript is clear regarding what portion of the testimony was the subject

11.

Here, there is a strong inference of common plan, the source of the information regarding either offense is not a concern, the uncharged offense is not more inflammatory than the present offense, and the two incidents are not separated too distantly in time. (*People v. Dancer*, *supra*, 45 Cal.App.4th at p. 1690.)

As described above, the court considered the prejudicial effect of the evidence, but concluded it had more substantial probative value. The trial court also disagreed with defendant's argument the evidence would confuse the issues or mislead the jury. We perceive no error in the trial court's determination. There was no abuse of discretion. (*People v. Homick*, *supra*, 55 Cal.4th at p. 865.)

Moreover, even if we were to find the evidence was improperly admitted, we would find no prejudice. That is, there is no reasonable probability defendant would have had a more favorable result in the absence of error. (*People v. Watson* (1956) 46 Cal.2d 818, 836.) Minutes after the stolen SUV was abandoned, defendant was found a short distance away. He was sweating profusely and was wearing clothing that matched the description of the driver of the stolen vehicle. Additionally, Officer Rinder positively identified defendant at the scene and again at trial.

Notably too, to the degree defendant argues the trial court erred by instructing the jury with CALCRIM No. 375 because the instruction seems to reference identity rather than common plan or design, assuming error, we conclude it was not prejudicial. In determining the prejudicial effect of an erroneously given instruction, we apply the *Watson* standard of prejudice (i.e., whether it is reasonably probable the defendant would have obtained a more favorable result had the instruction not been given). (*People v. Prieto* (2003) 30 Cal.4th 226, 249; *People v. Watson*, *supra*, 46 Cal.2d at p. 836.) Assuming CALCRIM No. 375 was erroneously given, any harm to defendant was minimal. That instruction stated the jury could consider evidence of the November 2006

of a readback, it controls. (See *People v. Harrison* (2005) 35 Cal.4th 208, 226; *People v. Malabag* (1997) 51 Cal.App.4th 1419, 1422-1423.)

12.

offense only if it found, by a preponderance of the evidence, defendant committed that offense. Furthermore, that instruction stated the jury then could, but was not required to, consider that evidence only for the limited purpose of determining whether defendant was the person who committed the charged offenses. It also instructed that that conclusion (if made) was only one factor to consider along with all of the other evidence presented at trial and was not sufficient, by itself, to prove defendant's guilt of the charged offenses, which must be proved by the People beyond a reasonable doubt.

As noted above, despite defendant's characterization of the evidence as weak or his identity as the driver being a "close call," the evidence presented was strong. We have reviewed video of the dash cam footage that was played for the jury. The difference in the clothing worn by the first person to exit the vehicle through the passenger door (the passenger) versus the second person to exit the vehicle through the passenger door (the driver) is compelling. The passenger is wearing all light-colored, possibly tan or khaki colored, clothing. The driver is wearing a light-colored or white T-shirt, starkly contrasting dark-colored shorts, and white socks. When defendant was spotted running near the scene of the stolen vehicle, Sergeant Blake noted he was wearing black shorts and white socks, and was carrying a white T-shirt.

In sum, considering the instructions as a whole, we conclude it is not reasonably probable defendant would have obtained a more favorable result had the court not instructed the jury with CALCRIM No. 375. (*People v. Prieto*, *supra*, 30 Cal.4th at p. 249; *People v. Watson*, *supra*, 46 Cal.2d at p. 836; *People v. Foster* (2010) 50 Cal.4th 1301, 1332-1333 [applying *Watson* standard to erroneous instruction that jury could consider evidence of defendant's prior crime with respect to issue of identity of perpetrator, and observing that, because evidence was admissible regardless of whether it was relevant to issue of identity, jury would have heard it even if trial court had not admitted it to establish defendant's identity as perpetrator]; see also *People v. Rivas* (2013) 214 Cal.App.4th 1410, 1421-1422.)

13.

**B.**    **Instruction Regarding Third Party Culpability**

Defendant complains that by failing to request an instruction regarding third party culpability, defense counsel provided ineffective assistance in violation of his state and federal constitutional rights. The People assert trial counsel may have had a tactical reason for not requesting the instruction. And, in any event, had the instruction been given pursuant to a request, a more favorable outcome was not reasonably likely.

To prevail on an ineffective assistance of counsel claim, the appellant must establish two things: (1) counsel's performance fell below an objective standard of reasonableness, and (2) prejudice occurred as a result. (*Strickland v. Washington* (1984) 466 U.S. 668, 687; *People v. Hernandez* (2012) 53 Cal.4th 1095, 1105; *People v. Bradley* (2012) 208 Cal.App.4th 64, 86-87.) The *Strickland* court explained prejudice is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland v. Washington*, *supra*, at p. 694.) Further, the high court stated a reasonable probability is "a probability sufficient to undermine confidence in the outcome" of the proceeding. (*Ibid*.)

Because there was another individual inside the stolen vehicle, defendant contends the identity of that individual was significant to the issue of the driver's identity, and therefore, he was "entitled to an instruction [on] third-party culpability as it pertains to that party's flight."

In *People v. Henderson* (2003) 110 Cal.App.4th 737, the defendant argued he was entitled to an instruction on the effect of flight by a third party as he relied upon a defense of third party culpability. (*Id.* at p. 741.) Division One of the Fourth District Court of Appeal held a defendant is entitled to such an instruction where it is prepared and submitted by the defense, and where there is proof the third party was aware of the discovery of the crime charged. That court concluded the trial court had no sua sponte duty to instruct on the issue. (*Id*. at pp. 741-743.) The court went on to find that, even assuming such a duty existed, any error was harmless because defendant Henderson was not entitled to a pinpoint instruction regarding the alleged flight of a culpable third party

14.

as "[t]he evidence of third party culpability was quite weak." (*Id*. at p. 744.) Further, the court noted the "trial court did inform the jury of the purpose of the third party defense evidence, namely to address the question of whether the prosecution had proved identity of the perpetrator beyond a reasonable doubt. Additionally, trial counsel argued the matter of the alleged flight of the third party during closing arguments. Thus, the jury was clearly aware that the conduct of the third party was important in evaluating the issue of identity." (*Ibid*.)

Here, like *Henderson*, the evidence of third party culpability was weak. As pointed out previously, there was strong evidence defendant was the driver of the stolen vehicle, rather than its mere passenger. Officer Rinder testified he observed defendant driving the vehicle during the pursuit. The officer's credibility was a determination for the jury. Further, the video captured by Officer Bohanan's dash cam reveals the second person exiting the vehicle from the passenger door was wearing the same dark colored shorts and white socks that defendant was wearing when he was stopped by Sergeant Blake. On the other hand, the first person exiting the vehicle—logically, the passenger— was wearing all light-colored or beige clothing. Instead of addressing the fact defendant's clothing so plainly matched that of the driver of the stolen vehicle, defendant characterizes Officer Rinder's testimony as "conflicted and tenuous," describes the dash cam video as "grainy," and concludes the evidence was not conclusive. Following review, we simply cannot agree with defendant's interpretation of this evidence.

Additionally, similar to *Henderson*, defense counsel was free to, and did, argue during closing arguments the alleged flight of the never-captured third party, whom he cast as the driver of the stolen vehicle. And the jury was instructed on reasonable doubt pursuant to CALCRIM No. 220.

For all of the foregoing reasons, even assuming defense counsel erred by not requesting a pinpoint instruction regarding third party culpability, defendant was not prejudiced by its omission. As explained above, it is not reasonably probable the

outcome would have been different had the instruction been given. (*Strickland v. Washington*, *supra*, 466 U.S. at p. 694.)

## C. Evidence Regarding Defendant's Poverty

Defendant contends the trial court erred when it permitted the admission of evidence in the form of his application for food stamp assistance, arguing its admission was unduly prejudicial and gratuitous thereby depriving him of a fair trial and due process of law. The People assert this evidence was properly admitted to show defendant was more than a casual passenger in the stolen vehicle.

### 1. References to Food Stamp Application

During the hearing on the motions in limine, defense counsel brought up the issue of paperwork found inside the stolen vehicle that included defendant's name:

> "[DEFENSE COUNSEL:] There is another issue with respect to, I think it's described as a booking sheet with [defendant]'s name on it in the vehicle. I'm asking that not be referred to as a booking sheet or referred to in any way that would suggest a prior arrest or incarceration. Simply paperwork with his name on it would be adequate.

> "THE COURT: Mr. [Prosecutor]? Any intent to offer a booking sheet?

> "[PROSECUTOR]: I'm going to offer paperwork items that have the defendant's name on them, Your Honor. And the officer does state in his police report … that there were some items of paperwork in the vehicle as follows: The officer states several of the papers which contain [defendant]'s name.

> "THE COURT: Well, we can refer to those papers as having [defendant]'s name and redact the word 'Booking Sheet.'

> "[PROSECUTOR]: Okay, Judge, that's fine.

> "THE COURT: What you're really after is indicia of [defendant]'s personal paperwork is in the car. He had the car long enough to leave some of his paperwork in it.

> "[DEFENSE COUNSEL]: Yes, that's the nature of my motion. I just don't want to refer to it as—

"THE COURT: Okay. We'll redact the word 'booking sheet' from that document or—and the officer not to refer to it as a booking sheet, but there were papers, there were legal papers with [defendant]'s name on it.

"[PROSECUTOR]: Okay, Judge. Fine.

"[DEFENSE COUNSEL]: Um—

"THE COURT: You can refer to them as legal papers with [defendant]'s name on them. Are you actually going to produce the papers or just have him testify to them?

"[PROSECUTOR]: I'll bring the papers and then we can decide on the redaction before the jury sees them.

"THE COURT: Okay."

In his opening statement, the prosecutor made the following remarks:

"Inside the stolen vehicle the police found some interesting items that you'll see. There were about 11 car keys. There was some paperwork in the name of [defendant]. There was a food stamp application, among other paperwork, in the name of … the defendant."

Defense counsel did not object to the foregoing statement when it was made. Rather, after giving his own opening statement, he raised the issue:

"THE COURT: We're outside the presence of the jury on this food stamp issue. Mr. [Prosecutor], it's part of the paperwork that's indicia connecting [defendant] to the vehicle?

"[PROSECUTOR]: Yes.

"THE COURT: It's certainly relevant in that respect, highly relevant. Characterizing it as a food stamp application, you feel that's unduly prejudicial, [defense counsel]?

"[DEFENSE COUNSEL]: Yes, I do, Your Honor. Especially since we had in limine motions yesterday designed to lessen or prevent the impact of documents in the vehicle. The only reference documents in the vehicle that is in the police reports or any of the discovery that I've received references a booking sheet. I made a specific motion yesterday that it not be referred to as a booking sheet because it was prejudicial. I also requested to view all of these items before we began the trial, and I was not able to do that this morning. The reference seems gratuitous to me.

17.

"THE COURT:  So we have a clear record, it wasn't to any fault of your own.  Mr. [Prosecutor], the documents weren't produced because the police department doesn't want to release the evidence.

"[PROSECUTOR]:  They won't bring them over … until they're going to be offered so they're at the Merced Police Department.

"THE COURT:  Right.  Okay.

"[DEFENSE COUNSEL]:  My request, just so the record is clear, is for a mistrial.  And in the event the Court denies that I'm asking for a curative instruction to admonish the jury not to consider that, although I don't believe that can be unrung.

"THE COURT:  Okay.  The request for mistrial is denied.  The issue on mistrial is whether or not the defendant, the statement or event which is the subject of the motion is so prejudicial that the defendant is denied a fair trial.  And again, the central issue of the case is who's driving and how strong the evidence is in that issue.  That hasn't changed at all.

"Certainly the paperwork showing—belonging to [defendant] as indicia of his involvement with the vehicle as something more than just a passenger in that he has a food stamp application would be relevant to that.  I think it's very relevant to that issue.

"Now I certainly will—there is an instruction that they're not to have any bias against defendant because they list socioeconomic criteria, ethnicity, etc.  I will add something about socioeconomic circumstance or application for food stamps."

Ultimately, the jury was instructed with CALCRIM No. 200 which provided, in relevant part:

"Do not let bias, sympathy, prejudice, or public opinion influence your decision.  Bias includes, but it not limited to, bias for or against the witnesses, attorneys, defendant or alleged victim, based on disability, gender, nationality, national origin, race or ethnicity, religion, gender identity, sexual orientation, age, *socioeconomic status*, *or possible association with a local club*, *or having filed for public assistance*."  (Italics added.)

## 2.    Analysis

"An appellate court applies the abuse of discretion standard to review any ruling by a trial court on the admissibility of the evidence, including a ruling on an Evidence

18.

Code section 352 objection." (*People v. Cox* (2003) 30 Cal.4th 916, 955, overruled on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

"Under the well-established rule, a defendant's poverty generally may not be admitted to prove a motive to commit a robbery or theft; reliance on such evidence is deemed unfair to the defendant, and its probative value is outweighed by the risk of prejudice." (*People v. Koontz* (2002) 27 Cal.4th 1041, 1076.)

> "While 'lack of money is logically connected with a crime involving financial gain … [t]he trouble is that it would prove too much against too many.' [Citation.]  As the court explained in *United States v. Mitchell* (9th Cir. 1999) 172 F.3d 1104, 'Lack of money gives a person an interest in having more.  But so does desire for money, without poverty.  A rich man's greed is as much a motive to steal as a poor man's poverty.  Proof of either, without more, is likely to amount to a great deal of unfair prejudice with little probative value.'" (*People v. Carrillo* (2004) 119 Cal.App.4th 94, 102.)

Some exceptions apply to the general rule that evidence of a defendant's poverty is inadmissible.  "[E]vidence of the defendant's indebtedness or relative poverty may be admitted without undue prejudice to persons of limited means in order 'to eliminate other possible explanations for a defendant's sudden wealth after a theft offense.'" (*People v. Cornwell* (2005) 37 Cal.4th 50, 96, overruled on other grounds in *People v. Doolin*, *supra*, 45 Cal.4th at p. 421, fn. 22.)  Evidence concerning the poverty of a defendant is also admissible if offered to refute a claim by the defendant that he or she did not commit the offense because the defendant was not in need of any money. (*People v. Koontz*, *supra*, 27 Cal.4th at p. 1076.)

None of the aforementioned exceptions apply here.  Assuming it was error for the trial court to admit evidence of the food stamp application, defendant did not suffer any prejudice.  "[G]enerally, violations of state evidentiary rules do not rise to the level of federal constitutional error." (*People v. Benavides* (2005) 35 Cal.4th 69, 91.)  "Accordingly, the proper standard of review is that announced in *People v. Watson*[, *supra*,] 46 Cal.2d 818, 836, and not the stricter beyond-a-reasonable-doubt standard reserved for errors of constitutional dimension (*Chapman v. California* (1967) 386 U.S.

19.

18, 24)." (*People v. Fudge* (1994) 7 Cal.4th 1075, 1103.)  Under *Watson*, we must consider whether, after an examination of the entire cause, it appears reasonably probable the defendant would have obtained a more favorable outcome had the error not occurred. (*People v. Watson*, *supra*, at p. 836.)

As we have already determined, despite defendant's assertion to the contrary, the evidence defendant was the driver of the stolen vehicle was strong.  Officer Rinder identified defendant as the driver, having observed defendant behind the wheel as the officer passed the stolen vehicle during the pursuit.  Video from Officer Bohanan's dash cam shows two persons in the vehicle.  The first person to exit the vehicle via the passenger door was wearing all light-colored clothing.  The second person to exit via the passenger door—the driver—was wearing a white T-shirt, black or dark-colored shorts, and white socks.  When Sergeant Blake stopped defendant not far from the scene of the vehicle stop, defendant was sweating profusely and was carrying a white T-shirt.  He was also wearing black shorts and white socks.  Even without considering documents bearing defendant's name found in the stolen vehicle,[8] it was not reasonably probable, absent the error, a more favorable outcome to defendant would have been reached.

Moreover, the trial court expressly admonished the jury it was not to decide the case on "bias, sympathy, prejudice, or public opinion," nor was it to consider evidence defendant applied for public assistance.  Thus, the impact of the evidence was limited by way of the admonishment.  (See *People v. Lewis* (2001) 25 Cal.4th 610, 637.)  Jurors are presumed to follow the law as given to them by the trial court.  (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.)

In sum, defendant was not prejudiced by admission of the food stamp application.

---

[8]The food stamp application was dated April 19, 2011, or about two weeks prior to the date of the stop and four days prior to the vehicle having been stolen from Mr. Arancibia.

20.

**D.      Prosecutor's Alleged Misstatement of Law**

Next, defendant maintains the prosecutor committed misconduct by taking "liberties with the evidence" and misstating the law regarding the elements of the crime of receiving stolen property. These errors, he contends, deprived him of the right to a fair trial. The People initially assert defendant has forfeited this claim for purposes of appeal by failing to object below. Moreover, the People contend the prosecutor did not misstate the law. Error, if any, was harmless, particularly where the jury did not reach the receiving stolen property count.

### 1.      Relevant Legal Standards

"'Although counsel have "broad discretion in discussing the legal and factual merits of a case [citation], it is improper to misstate the law. [Citation.]"' [Citations.] In particular, it is misconduct for counsel to attempt to absolve the prosecution from its prima facie obligation to overcome reasonable doubt on all elements. [Citations.]" (*People v. Katzenberger* (2009) 178 Cal.App.4th 1260, 1266.)

"'The applicable federal and state standards regarding prosecutorial misconduct are well established. "'A prosecutor's … intemperate behavior violates the federal Constitution when it comprises a pattern of conduct so "egregious that it infects the trial with such unfairness as to make the conviction a denial of due process."'" [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves ""'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury."'" [Citation.]" (*People v. Navarette* (2003) 30 Cal.4th 458, 506.)

Prosecutorial misconduct requires reversal only if it results in prejudice to the defendant. (*People v. Fields* (1983) 35 Cal.3d 329, 363.) Where it infringes upon the defendant's constitutional rights, reversal is required unless the reviewing court determines beyond a reasonable doubt the misconduct did not affect the jury's verdict. (*People v. Harris* (1989) 47 Cal.3d 1047, 1083.) Prosecutorial misconduct that violates only state law is cause for reversal when it is reasonably probable a result more favorable to the defendant would have occurred had the prosecutor refrained from the objectionable conduct. (*People v. Barnett* (1998) 17 Cal.4th 1044, 1133.)

21.

The issue of prosecutorial misconduct is forfeited on appeal if not preserved by timely objection and request for admonition in the trial court.  (*People v. Cunningham* (2001) 25 Cal.4th 926, 1000.)  If an objection has not been made, ""'"the point is reviewable only if an admonition would not have cured the harm caused by the misconduct"'"" (*id*. at pp. 1000-1001) or if an objection would have been futile.  (*People v. Hill* (1998) 17 Cal.4th 800, 820-821, overruled on another ground in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13.)

### 2.      The Relevant Proceedings Below

During closing arguments to the jury, the prosecutor argued as follows:

> "The third charge is receiving stolen property, this vehicle.  Defendant is charged in Count 3, receiving stolen property.  To prove the defendant guilty of this crime, the People must prove that, Number 1, the defendant received property that had been stolen, namely 2001 GMC Jimmy, SUV.  And Number 2, when the defendant received this property he knew it had been stolen.
>
> "Property is stolen if it was obtained by any kind of theft.  To receive property means to take possession or control of it.  Mere presence near or access to the property is not enough.  Two or more people can possess the property at the same time.  Person does not have to actually hold or touch something to possess it.  It is enough if this person has control over it or the right to control over it, either personally [or] through another person.
>
> "What's the evidence on that charge?  Number 1, the defendant was driving this vehicle.  It was apparent that he knew that this vehicle had been stolen given his behavior.  He fled from the police.  And it's apparent under these circumstances that he knew the vehicle was stolen, given his behavior, given his actions.  And two, when the defendant received the property, he knew the property had been stolen.
>
> "Well, he was receiving the property, he was in possession of the property, not just for a second or instant, he was in possession of that property during the entire chase, obviously.  Possession is something that can continue.  You can possess something for an extended period of time.  So that's the third charge."

22.

In his closing argument, defense counsel argued the People had failed to prove defendant was the driver. He also argued that because defendant was not the driver of the vehicle, he did not possess the stolen property. In rebuttal, the prosecutor revisited the issue:

> "Now the attorney for defendant, he says that his client was not the driver. Even if we were to find—even if you were to find that the defendant was the passenger, he's still guilty …. [¶] … [¶]

> "… I was referring to, when we left off, Count 3. The defendant in Count 3 is charged with receiving stolen property in violation of … Section 496(a). To prove the defendant is guilty of this crime the People must prove the defendant received property that had been stolen, and when the defendant received the property he knew the property had been stolen. And then there is a definition of stolen and a definition of received property.

> "Now the attorney for the defendant says, well, if the defendant were the passenger, he's not guilty of any of the first four charges. He's not guilty of Count 1, 2, 3 or 4. He's only guilty of Count 5.

> "Even if you were to find—the prosecution maintains you should not buy this account of what happened in accordance with what the attorney told you. But even if you would find that the defendant were the passenger he's still guilty of Count 3 and here's why.

> "To receive property means, and this is this bottom part, to take possession and control of it, mere presence near or access to the property is not enough, two or more people can possess the property at the same time. Person does not have to actually hold or touch something to possess it, is enough if the person has control over it or the right to control if either personally or through another person.

> Well, isn't it very apparent from the evidence that both of these defendants, based upon their actions, they knew they were in a stolen vehicle, that's why they bolted this way. They both were—had a certain activity they were up to.…

> "And the passenger, if he were on trial, the passenger would be guilty of receiving stolen property. Why? Because the passenger is also in possession of this vehicle. The passenger has control of this vehicle and the right to control it, either personally or through another person. The passenger can say, stop this vehicle, let me drive, stop this vehicle I want to drive. Let me take over driving."

Finally, as to this charge in particular, the prosecutor asked the jury to focus "solely on the evidence then.  Look for yourself at these burglarious tools and you decide on the basis of the evidence what was going on."

### 3.  Analysis

Assuming without deciding that the issue was not forfeited for purposes of appeal, and even assuming the prosecutor misstated the law, we find no prejudicial error.

Significantly here, the jury was instructed to reach a verdict on the theft (Veh. Code, § 10851) charge first.[9]  It did so, signing only the verdict forms pertaining to counts 1, 2, 4 and 5.  The jury did not convict defendant of receiving stolen property.  It convicted him on all other counts—all those requiring the jury to find the defendant was the driver of the stolen vehicle.  Thus, it was not necessary for the jury to consider the receiving stolen property charge.  (See *People v. Ceja* (2010) 49 Cal.4th 1, 10.)  Therefore, whether or not the law regarding the elements of receiving stolen property was accurately stated, any error is plainly harmless.

## E.  Ineffective Assistance of Counsel

As an alternative to the foregoing argument, defendant complains that if this court determines no error occurred as the result of the prosecutor's misstatement of the law, trial counsel was ineffective for failing to make a timely objection thereto.  The People assert that because trial counsel could have reasonably concluded the prosecutor did not misstate the law, any objection would have been unsuccessful.  Additionally, the People contend, had any objection been successful, it is not reasonably probable defendant would have received a more favorable outcome.

---

[9]Specifically, the jury was instructed as follows:  "The defendant is charged in Count 1 with Unlawful Driving of a Vehicle and in Count 3 with Receiving Stolen Property.  You must first decide whether the defendant is guilty of Unlawful Driving of a Vehicle.  If you find the defendant guilty of Unlawful Driving of a Vehicle, you must return the verdict form for Receiving Stolen Property unsigned.  If you find the defendant not guilty of Unlawful Driving of a Vehicle you must then decide whether the defendant is guilty of Receiving Stolen Property."  (CALCRIM No. 3516.)

24.

As previously indicated, in order to prevail on an ineffective assistance of counsel claim, a defendant must establish two things: (1) counsel's performance fell below an objective standard of reasonableness, and (2) prejudice occurred as a result. (*Strickland v. Washington*, *supra*, 466 U.S. at p. 687; *People v. Hernandez*, *supra*, 53 Cal.4th at p. 1105; *People v. Bradley*, *supra*, 208 Cal.App.4th at pp. 86–87.) The *Strickland* court explained prejudice is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland v. Washington*, *supra*, at p. 694.) Further, the high court stated that a reasonable probability is "a probability sufficient to undermine confidence in the outcome" of the proceeding. (*Ibid.*)

As the previous excerpts from closing argument concerning the receiving stolen property count make clear (see pt. D.2., *ante*), the alleged misstatements by the prosecutor came in rebuttal. Read in context, it is plain the prosecutor was responding to defense counsel's argument that the People had failed to prove defendant was the driver. The prosecutor then read directly from the jury instruction pertaining to receiving stolen property and argued that even were the jury to accept that defendant was the passenger, the passenger could still be convicted of receiving stolen property. We do not view this, in context, to be a misstatement of the law. Further, CALCRIM No. 1750 plainly states, in pertinent part, that "[m]ere presence near or access to the property is not enough" to convict an individual of receiving stolen property.

Moreover, five hours of deliberation is not an extraordinarily lengthy period of time after four days of trial and closing arguments. The record, including the various jury questions and verdicts, indicates the jury took great care to examine the evidence and the law before reaching its verdicts in the face of the parties' debate over numerous facts and charges. It does not demonstrate the jury would have found defendant not guilty of receiving stolen property. (See, e.g., *People v. Avena* (1996) 13 Cal.4th 394, 435-436 [rejecting assumption that lengthy penalty deliberations indicated jury had difficulty reaching a decision].)

Even were we to find defense counsel erred by failing to object to the prosecutor's rebuttal argument, considering the second prong of the *Strickland* analysis, we find it is not reasonably probable the result of this proceeding would have been different but for the error. (*Strickland v. Washington*, *supra*, 466 U.S. at p. 694.) Again, despite defendant repeatedly assigning the evidence that he was the driver of the vehicle little value, the record demonstrates the evidence was quite compelling. As noted previously, the jury convicted defendant of four counts, three of which expressly required finding that defendant was the driver of the stolen vehicle. The jury did not buy defendant's argument that he was merely a passenger in the vehicle. Defendant has not met his burden.

## F. Alternative Sentencing Pursuant to Section 1170.9

Defendant maintains the trial court erred when it found he was not eligible for sentencing pursuant to section 1170.9 before it denied probation. More particularly, defendant contends the trial court "relied only on the assessment from probation," and thus failed to make its own findings regarding defendant's eligibility for alternative sentencing. The People contend the trial court did not err.

### 1. Relevant Procedural Background

On October 18, 2011, the trial court called the matter as follows:

> "[THE COURT:] This is time for sentencing, and I had thought that this was going to be an 1170(h) commitment, but it appears that violation of Vehicle Code section 2800.2, reckless evading a police officer, is a felony, is one of the exempt felonies. So this needs to go back to probation for a full report.
>
> "[DEFENSE COUNSEL]: Judge, could the minute order also note that I think [defendant] may qualify for sentencing under 1170.9, it's a provision that pertains to Veterans. And part of that provision requires an inquiry whether [defendant] is, in fact, a Veteran. I think probation would be helpful in making—helping the Court make that determination. It's my understand, [defendant] has told me, that he's a Gulf War Veteran and he's served overseas in Iraq.
>
> "THE COURT: What program, 1170.9? Is there—did he suffer from an injury in the service?

26.

"[DEFENSE COUNSEL]: No, but [defendant] has a substance abuse problem. I don't know [defendant] well enough to know whether he has PTSD from service. Whether the substance abuse is related to his service in the military. [¶] I do know that he has prior arrest for methamphetamine. I believe he has a prior conviction for methamphetamine. I think one—I believe one of the probation cases that is before the Court for sentencing is [a Health and Safety Code section] 11377 charge.

"THE COURT: No. You mean the two VOP cases? Two VOP cases are dirk and dagger cases. Each of them was a dirk and dagger.

"[DEFENSE COUNSEL]: Both of them are?

"THE COURT: Both of them.

"THE CLERK: One of them is a drug case, [Health and Safety Code section] 12560.

"THE COURT: Okay. Yeah. Well, he pled to possession of dirk and dagger. He had possession of meth in one of them. He's got two possession of prohibited weapons, two dirk and dagger convictions and one meth. I don't see enough evidence for substance abuse.

"[DEFENSE COUNSEL]: I think maybe that's just because right now all that's before the Court are the pending VOP files. For instance, the Court doesn't have a copy of [defendant]'s RAP Sheet. And also probation hasn't met with [defendant] to get his personal history. That's why I thought it might be helpful.

"THE COURT: I'll have them explore it in the probation report.

"[DEFENSE COUNSEL]: Thank you.

"THE COURT: Matter is referred to probation for full probation report because it appears that the conviction of Vehicle Code 2800.2(a) is an offense which requires a prison commitment.

"In the probation report they should evaluate and make a recommendation as to whether [defendant] may have committed the current offenses as a result of a substance abuse problem and whether he would benefit from any type of treatment provided under … 1170.9."

On November 29, 2011, following receipt of the probation officer's report, the court began by noting "[p]robation had done some research and analysis of those facts and finds that he is not eligible for treatment under … 1170.9 for a disability or substance

abuse problem arising out of his military service." The court then stated it found defendant unsuitable for probation. When the trial court began to address aggravating factors, defense counsel interrupted:

> "[DEFENSE COUNSEL]: Judge, I'm sorry. I thought when you asked if we were prepared to proceed to sentencing I thought you were going to invite us to speak.

> "THE COURT: Oh, sure, I'm sorry. Sure. Go ahead, [counsel]. [¶] … [¶]

> "[DEFENSE COUNSEL]: With respect to the rest of the probation report I'd ask the Court to take into consideration [defendant]'s prior Honorable service in the military, that is detailed to some extent in the probation report.

> "I'd also ask the Court to consider that [defendant] has a long standing substance abuse problem with methamphetamine and other substances, that is corroborated by his statements to probation. It's also corroborated by his prior convictions. I think those played a significant— his substance abuse problem played a significant role in the crime that was committed in this particular case."

After hearing from defendant's mother, and without any further comment to its findings regarding the request pursuant to section 1170.9, the trial court sentenced defendant to five years in prison.

### 2.     The Probation Report

The probation report filed November 29, 2011, included a summary of defendant's adult record as maintained by the California Department of Justice. That information indicates that between 1989 and 2010, defendant was arrested on nine occasions. More particularly, in 1989 and on two occasions in 2007, defendant was arrested for theft related offenses. In 2006 and again in 2007, defendant was arrested for narcotics related offenses. In 2008, he was arrested for driving under the influence and related traffic offenses. In 2009, defendant was arrested for resisting arrest, disorderly conduct, and "criminal street gang." In 2010, defendant was arrested for possession of a concealed weapon and possession of a controlled substance and narcotics paraphernalia. The probation report also notes "defendant's criminal record also includes charges for

28.

carrying a loaded firearm, transportation of narcotics, spousal abuse, vehicle theft, unlawful registration, and passing fictitious checks."

Included as personal history, the probation report details the following:

"According to the defendant, he stated he went into the United States Navy in 1990, and was honorably discharged (DD214) in 1992. He was stationed in San Diego and then deployed for nine months to Bahrain. The defendant failed to identify his occupation in the Navy and did not relay to this officer any specific experience or event that may have caused his Post Traumatic Stress Disorder. Bahrain is an island in the Persian Gulf just off the Saudi Arabian coastline. This officer learned that the Bahrain base served as a western air base during the Persian Gulf War and continues to serve as the base of the United States Fifth fleet, which patrols the Gulf today. [¶] … [¶]

"This officer spoke with the defendant extensively about his substance abuse history. The defendant started drinking alcohol at the age of eight (8) years old. The last time he drank alcohol was the day before his arrest. The defendant stated he only drinks occasionally, but did include the statement that at one point he was drinking on a daily basis. The defendant started smoking marijuana when he was twelve (12) years old. He last smoked marijuana the week of his arrest. The defendant stated he smokes occasionally and uses marijuana for relaxation or to alleviate pain. The defendant stated he started using cocaine when he was twelve (12) years old and used until approximately ten years ago. The defendant started using methamphetamine when he was seventeen (17) years old and he last used methamphetamine the day of his arrest. He stated he uses methamphetamine when he is feeling 'stressed' or he is fighting with his mother. The defendant admitted he had also experimented during his high school years with 'mushrooms' and he liked to do LSD every 4th of July."

With particular regard to the probation department's evaluation regarding defendant's suitability for alternative sentencing pursuant to section 1170.9, the following was noted:

"The defendant alleges the offenses he has committed were a result of his substance abuse problems which arose from Post Traumatic Stress Disorder (PTSD) after his military service. The defendant brought up the issue of [section] 1170.9 …, which indicates that if a person convicted of a crime for which he would otherwise be incarcerated, is found to have committed that offense as a result of sexual trauma, traumatic brain injury, post traumatic stress disorder, substance abuse or mental health problems

29.

stemming from service in the United States Military, the court shall send that person for appropriate treatment instead of incarceration.

"After a thorough investigation into the defendant's personal history, and an exhaustive evaluation of the Persian Gulf War during the period of 1990-1992, this officer believes that the defendant's substance abuse history arose quite some time before his military service and his initial foray into criminal behavior also started before he enlisted in the military. [¶] … [¶]

"This officer appreciates the defendant would like to participate in a drug treatment program and this officer personally believe[s] he needs an intensive treatment program due to the fact he started ingesting illegal substances at the age of eight (8) years old.  The defendant has been given several opportunities to participate in substance abuse treatment on his other grants of probation and has failed to take advantage of the opportunity.

"Due to the defendant's charges, the defendant is ineligible for probation.  This officer also does not believe the defendant is eligible under [section] 1170.9 … to be sent to a Veterans Treatment Center.  Due to the defendant's charge of [section] 2800.2(a) of the California Vehicle Code, the defendant is ineligible to be incarcerated at the local level.

"Therefore, it is recommended the court order the defendant to the Department of Corrections and Rehabilitation for a term specified by law.  Time credits for this matter are attached for the court's review."

**3.    Analysis**

Section 1170.9 was enacted in 1982 to "offer[] the trial judge a meaningful alternative to either probation or imprisonment in the case of Vietnam veterans convicted of a felony who might otherwise be committed to state prison."  (*People v. Bruhn* (1989) 210 Cal.App.3d 1195, 1198.)  It authorized the court, in an appropriate case, to "commit such a defendant for a time period equal to the prison term to a federal facility for treatment for substance abuse or psychological problems resulting from Vietnam combat service."  (*Ibid.*)

In 2006, the Legislature found section 1170.9 was "not sufficient to cover returning Iraq and Afghanistan veterans," and therefore amended the section "to extend the opportunity for alternative sentencing to all combat veterans, regardless of where or

when those veterans served our country, when those veterans are found by the court to be suffering from" posttraumatic stress disorder (PTSD).  (Stats. 2006, ch. 788, § 1(d), (e).) Subdivision (a) of the 2006 version required a mental health assessment of any qualifying veteran convicted of a criminal offense who alleges he or she committed the offense as a result of psychological problems "stemming from service in a combat theater in the United States military."[10]  Subdivision (b) authorized the court to order a defendant who suffers from PTSD, substance abuse or psychological problems as a result of service in a combat theater and who is "otherwise eligible for probation" and actually placed on probation, "into a local, state, federal, or private nonprofit treatment program for a period not to exceed that which the defendant would have served in state prison or county jail, provided the defendant agrees to participate in the program and the court determines that an appropriate treatment program exists."[11]

Effective January 1, 2011, subdivision (a) of section 1170.9 was amended to extend the availability of a mental health assessment to all military veterans regardless of whether or not they served in a combat theater.[12]  (Subd. (b) of § 1170.9 was unchanged

[10]Former subdivision (a) of section 1170.9 provided in full:  "In the case of any person convicted of a criminal offense who would otherwise be sentenced to county jail or state prison and who alleges that he or she committed the offense as a result of post-traumatic stress disorder, substance abuse, or psychological problems stemming from *service in a combat theater* in the United States military, the court shall, prior to sentencing, hold a hearing to determine whether the defendant was a member of the military forces of the United States who served in combat and shall assess whether the defendant suffers from post-traumatic stress disorder, substance abuse, or psychological problems as a result of that service."  (Italics added.)

[11]Subdivision (b) of section 1170.9 provides in full:  "If the court concludes that a defendant convicted of a criminal offense is a person described in subdivision (a), and if the defendant is otherwise eligible for probation and the court places the defendant on probation, the court may order the defendant into a local, state, federal, or private nonprofit treatment program for a period not to exceed that which the defendant would have served in state prison or county jail, provided the defendant agrees to participate in the program and the court determines that an appropriate treatment program exists."

[12]Subdivision (a) of section 1170.9 now provides:  "In the case of any person convicted of a criminal offense who could otherwise be sentenced to county jail or state prison and who alleges that he or she committed the offense as a result of sexual trauma, traumatic brain injury, post-traumatic stress disorder, substance abuse, or mental health problems stemming from service in the United States military, the court shall, prior to sentencing, make a determination as

31.

by the 2011 amendment.) Because defendant committed his crime in 2011, the requirement pertaining to service in a combat theater is not applicable to him.[13]

The mandatory nature of subdivision (a) of section 1170.9 reflects the importance our society places on protecting these individuals. The court must seriously consider a defendant's allegations that he or she may qualify for the benefits provided by section 1170.9 and should make every attempt to respect the related process. Even if probation is ultimately denied, an assessment conducted pursuant to subdivision (a) will assist the court in its sentencing determinations.

Disregarding the requirement of service in a combat theater in light of the 2011 amendment to section 1170.9,

> "the following conditions must be satisfied: (1) the defendant must have served … [as] a member of the United States Armed Forces; (2) the defendant must suffer from PTSD, substance abuse, or psychological problems as a result of that service; (3) the defendant must be eligible for probation; (4) the court must place the defendant on probation; (5) there must be an appropriate local, state, federal, or private nonprofit program that can treat the defendant; and (6) the defendant must agree to participate in that program. If those requisites have been met, the trial court then has *discretion* to order the defendant into the treatment program for a period not to exceed that which he would have served in prison. [Citation.]" (*People v. Ferguson* (2011) 194 Cal.App.4th 1070, 1089.)

In this case, defendant did not establish he met the second, third and fourth conditions. Further, despite defendant's assertion to the contrary, the court seriously considered defendant's allegation of qualification. It ordered a full probation report be prepared and expressly required a recommendation regarding alternative sentencing pursuant to section 1170.9. That report contained defendant's criminal history and

---

to whether the defendant was, or currently is, a member of the United States military and whether the defendant may be suffering from sexual trauma, traumatic brain injury, post-traumatic stress disorder, substance abuse, or mental health problems as a result of that service. The court may request, through existing resources, an assessment to aid in that determination."

[13]Nevertheless, the probation report addresses this issue and concluded that "Bahrain was used only for 'war games' or training personnel for combat. Bahrain never saw any ground fighting during the 1990-1992 time spans."

addressed the alternative sentencing issue. The trial court reviewed and considered probation's recommendation regarding section 1170.9 and concurred, finding defendant not eligible for alternative sentencing. Additionally, in denying probation, the court noted defendant's "record and … past performance on probation" were not good. It determined defendant "was not a good candidate for probation."[14] The court then considered defense counsel's argument and the statement from defendant's mother before stating: "The Court *reiterates* its reasons for selecting Count 2, violation of Vehicle Code Section 2800.2, the upper term of three years for the reasons previously stated." (Italics added.)

Moreover, when defendant's mother interrupted the pronouncement of sentence to ask if it was possible her son could be ordered to a Delancy Street type facility, the court stated the following:

> "No, it's not. It's not an option that's available to your son. That's not an option that's available to your son at this point. Okay. This is—it's the Court's obligation to impose the appropriate sentence. He's been given plenty of chances, plenty of chances."

In sum, the trial court did not err. It found there was no evidence of PTSD by adopting the conclusion of the probation officer who noted defendant neither claimed to have endured an event that caused PTSD, nor did he identify any job or position he may have held during his military service that would explain PTSD. It also found there was no evidence of substance abuse arising from defendant's service in the military, agreeing with the probation report that noted defendant's substance abuse issues arose well before his military service as evidenced by his personal and criminal histories. We disagree

---

[14]"The decision whether to grant or deny probation is reviewed under the abuse of discretion standard. [Citations.] 'An order denying probation will not be reversed in the absence of a clear abuse of discretion. [Citation.] In reviewing the matter on appeal, a trial court is presumed to have acted to achieve legitimate sentencing objectives in the absence of a clear showing the sentencing decision was irrational or arbitrary. [Citations.]' [Citation.]" (*People v. Ferguson*, *supra*, 194 Cal.App.4th at p. 1091.) We note the trial court's denial of probation in this case was neither irrational nor arbitrary. There was no abuse of its discretion.

with defendant's assertion that the trial court relied only on the probation officer's report. It is clear from the record that the court considered the probation report, defense counsel's argument, and the statements proffered by defendant's mother. No error occurred.

## DISPOSITION

The judgment is affirmed.

_____
PEÑA, J.

WE CONCUR:


_____
LEVY, Acting P.J.


_____
CORNELL, J.